**PUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

EQUAL EMPLOYMENT OPPORTUNITY
COMMISSION,

       *Plaintiff-Appellant,*

and

DAVID WISE,

       *Intervenor-Plaintiff,*

       v.

FIRESTONE FIBERS & TEXTILES
COMPANY, a Division of BFS
Diversified Products; BFS
DIVERSIFIED PRODUCTS, LLC;
BRIDGESTONE AMERICAS HOLDING,
INCORPORATED,

       *Defendants-Appellees.*

No. 06-2203

DAVID WISE,
          *Intervenor-Plaintiff-Appellant,*

              and

EQUAL EMPLOYMENT OPPORTUNITY
COMMISSION,
                          *Plaintiff,*

              v.                                    No. 06-2241

FIRESTONE FIBERS & TEXTILES
COMPANY, a Division of BFS
Diversified Products; BFS
DIVERSIFIED PRODUCTS, LLC;
BRIDGESTONE AMERICAS HOLDING,
INCORPORATED,
                  *Defendants-Appellees.*

Appeals from the United States District Court
for the Western District of North Carolina, at Charlotte.
Robert J. Conrad, Jr., Chief District Judge.
(3:04-cv-00467)

Argued: December 5, 2007

Decided: February 11, 2008

Before WILKINSON and KING, Circuit Judges, and
Henry F. FLOYD, United States District Judge for the
District of South Carolina, sitting by designation.

Affirmed by published opinion. Judge Wilkinson wrote the opinion,
in which Judge King and Judge Floyd joined.

**COUNSEL**

**ARGUED:** James M. Tucker, U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, Washington, D.C.; Vicki B. Rowan, Charlotte, North Carolina, for Appellants. H. Bernard Tisdale, III, OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C., Charlotte, North Carolina, for Appellees. **ON BRIEF:** Ronald S. Cooper, General Counsel, Lorraine C. Davis, Acting Associate General Counsel, U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, Washington, D.C., for Appellant Equal Employment Opportunity Commission. James B. Spears, Jr., OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C., Charlotte, North Carolina, for Appellees.

---

**OPINION**

WILKINSON, Circuit Judge:

The United States Equal Employment Opportunity Commission and David A. Wise appeal the district court's grant of summary judgment for Firestone Fibers & Textiles Company in this Title VII action. Specifically, appellants contend that Firestone discriminated against Wise because of his religion when it failed to reasonably accommodate Wise's religious beliefs, resulting in his unlawful termination.

Because we find that Firestone provided Wise with a reasonable accommodation, and thus satisfied its obligation under 42 U.S.C. § 2000e(j), we affirm.

I.

A.

From December 1994 to September 2002, Firestone employed Wise at its two facilities in Gastonia and Kings Mountain, North Carolina. Both plants operate a treating unit for tire cord fabric that requires support from a testing laboratory. Each laboratory, when

fully staffed, has four people working per shift, including a laboratory floater and laboratory technician. There must always be someone working the laboratory technician shift when the treating unit is operating.

In 2001, while serving as a lab floater, Wise became a member of the Living Church of God. His religion prohibits him from working during the faith's weekly Sabbath, which takes place from sundown on Friday to sundown on Saturday. In addition, Wise must observe, and therefore cannot work on, seven sets of religious holidays. The holidays, which are based on certain biblical Holy Days, are Passover, the Feast of Unleavened Bread, the Day of Pentecost, the Feast of Trumpets, the Day of Atonement, the Feast of Tabernacles, and the Last Great Day. These holidays typically total twenty days, including fourteen that do not already coincide with part of the weekly Sabbath. Despite these numerous religious obligations, Wise did not encounter a work attendance problem in 2001 because, as a day-shift floater, he typically worked from 7:00 a.m. to 3:00 p.m., Mondays through Fridays. Thus, he usually was not scheduled to work during the Sabbath and used company vacation days for his non-Sabbath observances.

In February 2002, Firestone instituted a series of layoffs and, as a result, restructured its operations. Though he was not laid off, the restructuring forced Wise to change positions and shifts. Pursuant to the applicable collective bargaining agreement, Wise was bumped by a fellow employee with more seniority from his position as a floater to the job of lab technician. Additionally, and once again based on seniority, Wise also was assigned a new shift: 3:00 p.m. to 11:00 p.m., Mondays through Fridays, and Saturdays whenever the treating unit was operating (which, in 2002, was nearly every Saturday). The more desirable 7:00 a.m. to 3:00 p.m. shift, Wise's former time slot, went to employees with more seniority.

Because the 3:00-11:00 p.m. shift would conflict with his Sabbath on a weekly basis (i.e. Friday evenings and Saturday afternoons), Wise realized he would not possess enough leave time to meet both his work and religious obligations. Thus, soon after the change was implemented, Wise approached his supervisor, Kevin Cash, to talk about his predicament. Wise and Cash then met with Dennis Jozwiakowski, Firestone's Human Resources Manager, to discuss the matter.

Wise explained his situation and asked whether he could be accommodated in a way that would permit him to observe his weekly Sabbath without running afoul of the company's attendance policy.

In reviewing the request, Jozwiakowski considered several possible accommodations. First, he looked into whether Wise could be transferred to a different shift, particularly the 7:00 a.m. to 3:00 p.m. slot. Jozwiakowski determined that such a move was not feasible because Wise lacked the requisite seniority to make such a transition without contravening the governing collective bargaining agreement ("CBA").[1] Similarly, Jozwiakowski looked at whether Wise could be moved to a different position. This, too, was deemed a non-viable option as Wise lacked either the necessary seniority or required skills to be placed in a different job. Jozwiakowski also considered whether it would be possible to leave Wise's shift uncovered during the hours of his Sabbath. However, this was rejected because a lab technician had to be present at all times when the treating unit was operating. Likewise, Jozwiakowski determined that excusing Wise from the portions of his shift that conflicted with his Sabbath, without having the absences count against the company's attendance policy, would be too problematic. This was because of the burden such an accommodation would place on Firestone and especially on Wise's fellow employees, as someone would have to consistently work overtime to cover Wise's shift.

About a week after the initial meeting, Jozwiakowski informed Wise that Firestone could not make any special accommodation and that Wise would instead have to rely on the standard attendance accommodations provided to all employees. Specifically, the CBA granted all employees with Wise's seniority fifteen, eight-hour vacation days and three floating holidays. Firestone also allowed employ-

---

[1] Wise's employment relationship with Firestone was largely governed by a collective bargaining agreement between Firestone and the United Steelworkers of America, AFL-CIO, LLC, Local Union 1133. The agreement covers a variety of issues, including those involving grievance procedures (Article IV), hours and overtime (VI), vacations (VII), holidays (VIII), wages (IX), and leaves of absence (XI). Like most collective bargaining agreements, its provisions relied heavily on a seniority-based system (see Article V).

ees to swap shifts twice per quarter, for a total of eight times per year. In addition, pursuant to a company attendance policy referenced in the CBA, employees could take up to sixty hours of unpaid leave for any reason of their choosing. Finally, under the CBA, if an employee took less than thirty-six hours of unpaid leave, he could use up to three of his vacation days in half-day increments, for a total of six half-day vacations. However, under the company's attendance policy, an employee who exceeded sixty hours of unpaid leave would be terminated. Because of the staffing concerns noted above, this sixty hour cap remained in force with respect to Wise.

From February to September 2002, Wise utilized vacation days, floating holidays, and unpaid leave time in order to avoid working during the Sabbath and on religious holidays. He did not, however, make use of the available shift-swapping mechanisms. Cash also assisted Wise by altering the schedule when possible and having Wise work a 7:00 a.m. to 7:00 p.m. shift on certain Fridays when a lab worker from the 7:00 a.m. to 3:00 p.m. shift was absent.

On September 3, 2002, having exhausted his allotted vacation days and floating holidays, and close to using all of his unpaid leave time, Wise requested permission to take an unpaid leave of absence (which is distinct from the aforementioned sixty-hours unpaid leave). Wise requested leave for eleven days in September in order to observe two religious holidays: the Day of Atonement (Monday, September 16) and the Feast of Tabernacles (Friday, September 20 through Sunday, September 29). The request was received and considered by Jozwiakowski and Tom Kirksey, Firestone's Employee Relations Manager. After reviewing Firestone's handling of previous leaves of absence requests, Jozwiakowski and Kirksey determined that such requests had typically been granted only for "one-time," or non-recurring, events. Consistent with this precedent, they denied Wise's leave of absence request.

Wise did not report to work those days and, as a result, exceeded his sixty-hour unpaid leave limit on September 20, 2002. He was terminated by Firestone three days later.

B.

On March 19, 2003, Wise filed a charge of discrimination with the EEOC, alleging that Firestone had discriminated against him because

of his religion when it terminated him in September 2002. The charge claimed that Firestone violated Title VII when it failed to provide Wise with a reasonable accommodation that would allow him to observe his Sabbath and religious holidays without being fired. After conducting an investigation, the EEOC determined that the evidence supported Wise's allegations.

On September 9, 2004, the EEOC filed a complaint on behalf of Wise in federal district court against Firestone, BFS Diversified Products, LLC, (of which Firestone is a division), and Bridgestone Americas Holding, Inc., which is Firestone's parent corporation. The complaint alleged that the defendants had discriminated against Wise because of his religion and failed to accommodate his religious beliefs in violation of Title VII. Wise joined the suit as a plaintiff-intervenor and filed his own complaint in intervention. After taking discovery, the defendants requested that Bridgestone be dismissed as a defendant, since it was not named in the initial EEOC charge, and filed a motion for summary judgment on the merits of the plaintiffs' claims.

On September 13, 2006, the district court dismissed Bridgestone and granted the motion for summary judgment in favor of Firestone. As to the merits, the district court held that Firestone had "provide[d] reasonable accommodation for Wise's religious observances in accordance with Title VII requirements." It emphasized the various vacation and leave time policies that were available to Wise and the general nature of the seniority system. In the alternative, the court opined that "to the extent Firestone did not accommodate [Wise], its failure was legally excused by the [undue] burden such accommodation would" have inevitably caused Firestone. Therefore, the court concluded, no reasonable juror could find that Firestone had failed to satisfy its obligations under Title VII.

The EEOC and Wise filed timely appeals, which we now consider.

## II.

We briefly set forth the relevant legal standards that guide our decision in this case.

A.

Title VII makes it an "unlawful employment practice for an employer . . . to discharge any individual . . . because of such individual's . . . religion." 42 U.S.C. § 2000e-2(a)(1) (2000). "[S]omewhat awkwardly," Congress "illuminate[d] the meaning of religious discrimination" by how it defined "religion" for the purposes of Title VII. *Ansonia Bd. of Educ. v. Philbrook*, 479 U.S. 60, 63 n.1 (1986). Specifically, § 2000e(j) provides that "[t]he term 'religion' includes all aspects of religious observance and practice, as well as belief, unless an employer demonstrates that he is unable to reasonably accommodate to an employee's or prospective employee's religious observance or practice without undue hardship on the conduct of the employer's business." 42 U.S.C. § 2000e(j). Thus, an employer has a "statutory obligation to make reasonable accommodation for the religious observances of its employees, short of incurring an undue hardship." *Trans World Airlines, Inc. v. Hardison*, 432 U.S. 63, 75 (1977).

In religious accommodation cases, we employ a burden shifting scheme akin to the one articulated by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). A plaintiff must first establish a prima facie claim by showing that "(1) he or she has a bona fide religious belief that conflicts with an employment requirement; (2) he or she informed the employer of this belief; [and] (3) he or she was disciplined for failure to comply with the conflicting employment requirement." *Chalmers v. Tulon Co. of Richmond*, 101 F.3d 1012, 1019 (4th Cir. 1996) (quoting *Philbrook v. Ansonia Bd. of Educ.*, 757 F.2d 476, 481 (2d Cir. 1985), *aff'd on other grounds*, 479 U.S. 60 (1986)).

"If the employee establishes a prima facie case, the burden then shifts to the employer to show that it could not [reasonably] accommodate the plaintiff's religious needs without undue hardship." *Chalmers*, 101 F.3d at 1019; *see also* 42 U.S.C. § 2000e(j). This is a two-prong inquiry. To satisfy its burden, the employer must demonstrate *either* (1) that it provided the plaintiff with a reasonable accommodation for his or her religious observances *or* (2) that such accommodation was not provided because it would have caused an undue hardship — that is, it would have "result[ed] in 'more than a *de*

*minimis* cost' to the employer." *Philbrook*, 479 U.S. at 67 (quoting *Hardison*, 432 U.S. at 84).

Thus, if an employer has provided a reasonable accommodation, we need not examine whether alternative accommodations not offered would have resulted in undue hardship. *See Philbrook*, 479 U.S. at 68. In fact, "where the employer has already reasonably accommodated the employee's religious needs, the statutory inquiry is at an end." *Id.* This is because "the statute directs that any reasonable accommodation by the employer is sufficient to meet its accommodation obligation." *Id.* Moreover, the employer need not provide the employee with his or her preferred accommodation. *See id.* (finding no basis "for requiring an employer to choose any particular reasonable accommodation"). Rather, so long as the employer has offered a reasonable accommodation, it has fulfilled its duty under Title VII. *See id.* at 68-69.

### B.

Appellants contend, as they did before the district court, that an employer provides a reasonable accommodation *only* when it "eliminate[s] the conflict between the religious practice and the work requirement." *Brief of Appellant* at 26. Put another way, appellants argue that Title VII requires an employer, absent undue hardship, to totally accommodate an employee's religious observances. This would essentially limit the Title VII analysis to whether an employer's failure to provide total accommodation was based on undue hardship.

For the reasons that follow, we cannot accept appellants' interpretation of § 2000e(j) and hold that "reasonably accommodate" means what it says: *reasonably* accommodate.

The problem with appellants' "total" accommodation interpretation is that such a construction ignores the plain text of the statute, namely the inclusion of the word "reasonably" as a modifier of accommodate. If Congress had wanted to require employers to provide complete accommodation absent undue hardship, it could easily have done so. For instance, Congress could have used the words "totally" or "completely," instead of "reasonably." It even could have left out any qual-

ifying adjective at all. Rather, Congress included the term reasonably, expressly declaring that an employer's obligation is to "reasonably accommodate" absent undue hardship — not to totally do so.

As the statutory language of § 2000e(j) makes clear, this is not an area for absolutes. Religion does not exist in a vacuum in the workplace. Rather, it coexists, both with intensely secular arrangements such as collective bargaining agreements and with the intensely secular pressures of the marketplace. Hence the import of the statutory term "accommodate." The provision's use of the terms "reasonably" and "undue hardship" likewise indicates that this is a field of degrees, not a matter for extremes. Both terms are "variable ones," dependent on the extent of the employee's religious obligations and the nature of the employer's work requirements. *See EEOC v. Ithaca Indus., Inc.*, 849 F.2d 116, 120 (4th Cir. 1988) (en banc) (Wilkinson, J., concurring). This makes sense in light of the competing purposes and concerns underlying the right to religious accommodation in the workplace. On the one hand, the "principal goal" of Title VII is "to eliminate discrimination in employment." *Hardison*, 432 U.S. at 71 n.6. On the other hand, Congress recognized that because of business necessity and the legitimate rights of other employees, it could "not impose a duty on the employer to accommodate at all costs." *Philbrook*, 479 U.S. at 70.

In *Hardison*, while addressing Title VII's "reasonable accommodation requirement," the Court observed that "the statute provides no guidance for determining the degree of accommodation that is required of an employer." 432 U.S. at 74-75 (internal quotation marks omitted). Instead, the Court found that while "the employer's statutory obligation to make reasonable accommodation" was "clear," the precise "reach of that obligation ha[d] never been spelled out by Congress." *Id.* at 75. By struggling to locate the degree of accommodation required under § 2000e(j), the Court recognized that the line was one of reasonable, not total, accommodation.

A duty of "reasonableness" cannot be read as an invariable duty to eliminate the conflict between workplace rules and religious practice. *See, e.g.*, *Philbrook*, 479 U.S. at 69 ("We accordingly hold that an employer has met its obligation under [§ 2000e(j)] when it demonstrates that it has offered a *reasonable* accommodation to the

employee." (emphasis added)); *Ithaca*, 849 F.2d at 118 ("[Title VII] thus requires that an employer, short of undue hardship, make *reasonable* accommodations to the religious needs of its employees." (emphasis added)). *But see Baker v. The Home Depot*, 445 F.3d 541, 548 (2d Cir. 2006) (holding that the "offered accommodation cannot be considered reasonable because it did not eliminate the conflict between the employment requirement and the religious practice" (quoting *EEOC v. Ilona of Hungary, Inc.*, 108 F.3d 1569, 1576 (7th Cir. 1996))); *Opuku-Boateng v. California*, 95 F.3d 1461, 1467 (9th Cir. 1996) (holding that the employer must "eliminate the religious conflict," or "either accept the employee's proposal or demonstrate that it would cause undue hardship were it to do so").

Finally, appellants' view also fails to square with *US Airways, Inc. v. Barnett*, 535 U.S. 391 (2002). In that case, the Supreme Court interpreted a linguistically similar provision of the Americans with Disabilities Act ("ADA") that also contains a "reasonable accommodations" absent "undue hardship" clause. *See* 42 U.S.C. § 12112(b)(5)(A). The plaintiff argued that "reasonable accommodation" should mean only "effective accommodation." *Barnett*, 535 U.S. at 399. Specifically, he claimed that the Court, when interpreting the term, should only consider the "accommodation's ability to meet an individual's disability-related needs" and not any detrimental impact it might otherwise create, either on the employer or others. *Id.* In rejecting this interpretation, the Court remarked that "[f]or one thing, in ordinary English the word 'reasonable' does not mean 'effective.'" *Id.* at 400. It also observed that the use of the term "reasonable" in the disability context incorporates considerations other than those involving the effectiveness of the accommodation as it relates to the employee's needs. *See id.* at 400-401 (noting that "a demand for an effective accommodation could prove unreasonable because of its impact . . . on fellow employees"). Likewise, the term "reasonably accommodate" in the religious context incorporates more than just whether the conflict between the employee's beliefs and the employer's work requirements have been eliminated. Considering an accommodation's impact on both the employer and coworkers, for example, is appropriate when determining its reasonableness.

Although we hold the "reasonably accommodate" and "undue hardship" inquiries to be separate and distinct, this does not mean they are

not interrelated. Indeed, there is much overlap between the two. For instance, an accommodation that results in undue hardship almost certainly would not be viewed as one that would be reasonable. Likewise, the failure to consider alternative accommodations that pose no undue hardship may, generally speaking, influence the determination of whether an employer's offered accommodation was reasonable. *Cf. Ithaca*, 849 F.2d at 118 (finding the employer had violated Title VII given its "absolute lack of effort at accommodation"). Taken together, these standards ensure that while an employer must "actively attempt to accommodate an employee's religious expression or conduct," *Chalmers*, 101 F.3d at 1018, it is not required to do so "at all costs," *Philbrook*, 479 U.S. at 70.

In sum, if the plaintiff has established a prima facie case under *Chalmers*, the burden is on the employer to show either (1) that it has provided the plaintiff with a reasonable, though not necessarily a total, accommodation or (2) that such reasonable accommodation was not possible without causing undue hardship to the conduct of its business. With these principles in mind, we now turn to the case at hand.

## III.

For the purposes of summary judgment and this appeal, Firestone concedes that plaintiffs have established a prima facie case. The only question before us then is whether Firestone satisfied its obligation under Title VII. We hold that the district court properly determined that Firestone reasonably accommodated Wise's religious observances. Its grant of summary judgment was therefore appropriate.

## A.

Through various mechanisms, each significant in their own right, Firestone sought to assist Wise. These accommodations included pre-existing company policies provided to all employees and specific accommodations tailored to Wise's particular situation. These accommodations plainly satisfied Title VII.

First, Firestone's use of a seniority-based bidding system for working shifts "itself represent[s] a significant accommodation to the

needs, both religious and secular, of all of [its] employees." *Hardison*, 432 U.S. at 78. This is because a "seniority system represents a neutral way of minimizing the number of occasions when an employee must work on a day that he would prefer to have off." *Id.* When Jozwiakowski first reviewed Wise's request, he examined whether Wise could change shifts or positions. Unfortunately for Wise, Jozwiakowski could not grant such a move because Wise's preferred shift (7:00 a.m. to 3:00 p.m.) was occupied by employees with more seniority. As the district court noted, however, "[t]he fact that Wise does not currently benefit from the seniority system does not negate the reasonableness of the accommodation."

Second, the governing CBA provided Wise with fifteen, eight-hour vacation days and three floating holidays. Under the CBA, there were no restrictions on the reasons for which these holidays could be used. In addition, pursuant to the CBA, an employee with less than thirty-six hours unpaid leave could take three of his vacation days in half-day increments, for a total of six half-day vacations. These policies also represent a significant accommodation. Indeed, the EEOC Guidelines on Discrimination Because of Religion highlights the use of "[f]lexible [s]cheduling," such as "floating or optional holidays," as "[o]ne means of providing reasonable accommodation." 29 C.F.R. § 1605.2(d)(1)(ii) (2007). Furthermore, because these holidays did not contain any restriction on their use, they did not possess the sort of limitations as did the "personal business" days at issue in *Philbrook*. *See Philbrook*, 479 U.S. at 64; *see also id.* at 71 (noting that "unpaid leave is not a reasonable accommodation when paid leave is provided for all purposes *except* religious ones").

Third, Firestone allowed its employees to swap shifts up to twice per quarter, for a total of eight times per year. Such an accommodation has also been described as another means of reasonable accommodation. *See* 29 C.F.R. § 1605.2(d)(1)(i) (stating that the use of "voluntary swap[s]" constitutes a "[r]easonable accommodation"). Despite its availability, Wise did not attempt to take advantage of this accommodation. This, however, does not render the accommodation any less significant in the reasonableness calculus. *See Philbrook*, 479 U.S. at 69. In fact, *Philbrook* noted the importance of "bilateral cooperation" between an employer and employee in their search for a rea-

sonable accommodation. *Id.* (quoting *Brener v. Diagnostic Ctr. Hosp.*, 671 F.2d 141, 145-146 (5th Cir. 1982)).

Fourth, under its company attendance policy, Firestone provided all employees with sixty hours unpaid leave. This accommodation was commonly referred to as the "no fault" attendance policy, because employees could take unpaid leave for any reason of their choosing. Such a flexible, non-restrictive, attendance policy also represents a significant accommodation. *See Philbrook*, 479 U.S. at 70-71; 29 C.F.R. § 1605.2(d)(1)(ii).

These pre-existing attendance policies provided Wise and other Firestone employees with numerous ways of taking time off when necessary. Indeed, the combination of vacation days, floating holidays, shift swaps, and unpaid leave time could be structured in a way to permit most employees the opportunity to meet all of their religious observances.

Beyond these pre-existing attendance policies, Firestone offered Wise at least two additional accommodations. First, supervisor Cash allowed Wise to take more half-day vacations than allowed under the CBA. As noted above, if an employee had less than thirty-six hours unpaid leave, he could use up to three vacation days in half-day increments (for a total of six half-day increments). Although Wise had tallied more than thirty-six hours of unpaid leave, he was nonetheless allowed nine half-day vacations. This accommodation exceeded the CBA allowance in two ways: (1) he took vacation days in half-day increments despite having more than thirty-six hours unpaid leave and (2) he took nine, rather than the maximum six, half-day vacations. This demonstrates the willingness of Firestone to tolerate some variance from the CBA when it felt it was possible and appropriate. At the very least, it constitutes another meaningful accommodation to Wise's religious observances.

Second, Cash would review the shift schedules on a weekly basis. Notably, when someone from the 7:00 a.m. to 3:00 p.m. shift was absent on Fridays, Cash would try to schedule Wise to work a 7:00 a.m. to 7:00 p.m. shift, allowing him to observe his Sabbath without taking any leave time for Friday evening. When such a shift alteration was not possible, Cash would have to find someone to cover Wise's

absence. Given the limitations imposed by the seniority-based shift assignments, this weekly review of the work schedule, and particularly Cash's willingness to alter Wise's shift when possible, demonstrates that Firestone "actively attempt[ed] to accommodate [Wise's] religious" observances. *Chalmers*, 101 F.3d at 1018.

Based on the accommodations described above, we agree with the district court's holding that "no reasonable juror could conclude that Firestone did not provide reasonable accommodation for Wise's religious observances in accordance with its Title VII requirements."

## B.

Because we hold that Firestone reasonably accommodated Wise's religious observances, we need not consider whether alternative accommodations would have been appropriate. *See Philbrook*, 479 U.S. at 68-69. Nevertheless, appellants insist that the above accommodations did not constitute a reasonable accommodation under Title VII. Instead, they claim that Firestone, in order to satisfy its Title VII obligation, should have allowed Wise to take more unpaid leave time than permitted by the company's attendance policy and/or granted Wise's request for a religious leave of absence. We do not find this claim persuasive.

## 1.

Appellants first contend that Firestone should "have excused Wise from its attendance policy's sixty-hour limit on unpaid leave." *Brief of Appellant* at 38. They assert that this would have eliminated the conflict without adversely affecting Firestone or Wise's fellow employees.

It is well established that Title VII does not require an employer to violate the terms of a collective bargaining agreement, especially provisions pertaining to seniority-based scheduling. In *Hardison*, the Court stated plainly that it did "not believe that the duty to accommodate require[d] [an employer] to take steps inconsistent with [an] otherwise valid [collective bargaining] agreement." *Hardison*, 432 U.S. at 78-83. Likewise, an employer is not required to adversely impact

or infringe on the rights of other employees when accommodating religious observances. *See id.* at 81. In fact, it "would be anomalous to conclude that by 'reasonable accommodation' Congress meant that an employer must deny the shift and job preference of some employees, as well as deprive them of their contractual rights, in order to accommodate or prefer the religious needs of others." *Id.* Similarly, our own circuit has held that an employer is not required to accommodate an employee's religious need if it would "impose personally and directly on fellow employees." *Chalmers*, 101 F.3d at 1021; *see also Weber v. Roadway Express, Inc.*, 199 F.3d 270, 274 (5th Cir. 2000) (noting that the "mere possibility of an adverse impact on co-workers" is sufficient grounds for not providing the proposed accommodation); *Balint v. Carson City, Nevada*, 180 F.3d 1047, 1054 (9th Cir. 1999) (en banc) (observing that an employer is not required to provide an accommodation that "would cause more than a de minimis impact on coworkers, such as depriving coworkers of seniority rights or causing coworkers to shoulder the plaintiff's share of potentially hazardous work").

Therefore, when determining the reasonableness of a possible accommodation, it is perfectly permissible for an employer to consider the impact it would have on a seniority-based scheduling system as well as on other employees. While such considerations may not be based on mere speculation or conjecture, *see Brown v. Polk County, Iowa*, 61 F.3d 650, 655 (8th Cir. 1995) (en banc), an employer is not required "to wait until it [feels] the effects" of the proposed accommodation before determining its reasonableness, *see Weber*, 199 F.3d at 275 (citing *Beadle v. City of Tampa*, 42 F.3d 633 (11th Cir. 1995)). Indeed, employers must be given leeway to plan their business operations and possible accommodative options in advance, relying on an accommodation's predictable consequences along the way. If an employer reasonably believes that an accommodation would entail a violation of the applicable CBA or impose "more than a de minimis impact on coworkers," then it is not required to offer the accommodation under Title VII. *Balint*, 180 F.3d at 1054.

Given the frequency with which Wise wanted time off and the fact that a lab technician needed to be present whenever the treating unit was operating, Firestone asserts that excusing Wise from the attendance policy's sixty-hour leave limit would impose a disproportionate

and unfair burden on his fellow employees. Specifically, Firestone thought it could not accommodate Wise's request because "other lab employees would be imposed upon from the standpoint of being required to work to cover for [Wise]." *See* J.A. 152, 204, 219 (deposition of Dennis Jozwiakowski); *see also Brief of Appellees* at 48-49. When Wise was absent, a coworker would typically have to work overtime to cover his shift. To complicate matters, the times that needed to be covered, Friday evenings and Saturday afternoons, were "the most undesirable hours to get anybody to work overtime," making them the "hardest time . . . to fill." *See* J.A. 264 (deposition of Kevin Cash). Firestone feared that if it allowed Wise to take extra unpaid leave, this would undermine the seniority-based scheduling system and adversely affect the "shift and job preference of some employees." *Hardison*, 432 U.S. at 81.

We find this assessment reasonable. To begin, the company attendance policy and its sixty-hour cap are intimately tied to the seniority-based scheduling system utilized under the CBA. Because of Firestone's "around-the-clock operation[s]," *id.* at 80, and limited number of laboratory staff, allowing excessive amounts of unpaid leave time would in all likelihood deprive other employees of their desired shift preferences under the CBA. The sixty-hour cap underpins the entire scheduling structure, ensuring that employees are not required to work other, less-preferred shifts on an inordinate number of occasions. If Firestone were not to apply the attendance policy to one, and only one, employee, it would risk lowering morale by displaying favoritism, impinging on the shift rights of other employees, and violating the CBA and its seniority-based scheduling system.

Appellants retort that several of Wise's coworkers indicated they did not have a problem with covering his absences. While that may have been the case at the time, it was reasonable for Firestone to be concerned that such feelings would not be long-lived. This is because there is a significant difference between covering for an employee who is using the same amount of leave time as everyone, and covering for an employee who has been granted a special exception and allowed to take substantially more leave time than anyone. While the former could be viewed as just "part of the job," the latter may carry with it the sting of unfairness.

This is no small matter. Other employees may be left wondering why they are forced to work during valuable personal or family time despite having higher seniority. Indeed, such an accommodation treats an employee with a religious obligation differently than an employee with important, but non-religious, obligations of their own, such as caring for a sick child or spouse. *See Hardison*, 432 U.S. at 81. This could cause feelings of unequal treatment, which can cause real problems in a workforce. *See Estate of Thornton v. Caldor, Inc.*, 472 U.S. 703, 710 & n.9 (1985) (noting that "[o]ther employees who have strong and legitimate, but non-religious, reasons for wanting a weekend day off" would be "significant[ly] burden[ed]" if Sabbath observers were granted an absolute right not to work on their Sabbath). In addition to considering "lost efficiency" concerns, *see Hardison*, 432 U.S. at 84, it was permissible for Firestone to consider the rights and perceptions of fairness of other employees when determining whether to provide such an accommodation.

Because of the magnitude of the accommodation sought, and the sheer number of hours a small group of coworkers would have been forced to cover, it was sensible for Firestone to believe that Wise's proposed accommodation was not a reasonable one.

2.

Appellants' next claim — that Firestone should have granted Wise's leave of absence request — is equally unpersuasive. In September 2002, Wise requested an unpaid leave of absence for eleven days in order to observe two religious holidays. Jozwiakowski and Kirksey denied the request, noting that unpaid leaves of absence had traditionally been granted only for one-time, non-recurring, events. They also noted that Firestone had twice denied earlier religious-related leaves of absence requests, both pertaining to annual mission trips, because they were not one-time events. Those employees had to use vacation time instead.

For the reasons noted in the previous section, Firestone acted reasonably when it denied Wise's request. The CBA's leaves of absence section proclaims that "excessive or unwarranted absenteeism" "reduces Plant effectiveness and places an unnecessary burden on employees." In light of these concerns, it had been Firestone's prac-

tice to deny leaves of absence requests for recurring commitments. This is not surprising, as such absences would be, in essence, a convenient circumvention of the attendance policy's sixty-hour limit for unpaid leave time.

It is plain that Wise's religious observances were not one-time obligations. If Firestone were to grant a special exception for Wise for recurring obligations, it would have imposed the same type of burdens on the seniority-based scheduling system and Wise's fellow employees as if it had excused him from the attendance policy altogether. As discussed earlier, evenhandedness and fairness are of paramount importance to the functionings of any workplace. Co-workers have their rights, too.

### IV.

While we in no way question the sincerity of Wise's beliefs, we are equally convinced that the accommodations Firestone provided satisfied its obligations under § 2000e(j). Firestone's inability to completely accommodate Wise was not the result of a lack of desire, nor was it based on any intent to discriminate against his religion. Rather, the failure to achieve a total accommodation rests on the simple fact that Wise's request for such an extraordinary number of hours exceeded what could be reasonably accommodated under the circumstances described above.

Because we find no issue of triable fact, and because the district court correctly determined that Firestone reasonably accommodated Wise's religious beliefs,[2] the district court's decision is in all respects

*AFFIRMED*.

---

[2]We also affirm the district court's decision to dismiss Bridgestone as a defendant. Because we would have dismissed the case against Bridgestone, even if it were a proper party, on the same grounds as Firestone, we need not resolve the merits of the EEOC notification issue.