**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1405-19

IN THE MATTER OF
CLINTON BLOOMFIELD,
CITY OF NEWARK.

_____

Submitted April 28, 2021 – Decided May 28, 2021

Before Judges Vernoia and Enright.

On appeal from the New Jersey Civil Service Commission, Docket No. 2018-2466.

Fusco & Macaluso Partners, LLC, attorneys for appellant Clinton Bloomfield (Giovanna Giampa, on the brief).

Chasan Lamparello Mallon & Cappuzzo, PC, attorneys for respondent City of Newark (Cheyne R. Scott, of counsel and on the brief; Cindy Nan Vogelman, on the brief).

Gurbir S. Grewal, Attorney General, attorney for respondent Civil Service Commission (Debra A. Allen, Deputy Attorney General, on the statement in lieu of brief).

PER CURIAM

Petitioner Clinton Bloomfield appeals from an October 24, 2017 Civil Service Commission final agency decision upholding his removal from his conditional employment as a police officer with respondent City of Newark, Department of Public Safety, based on disciplinary charges related to petitioner's failure to appear for, and unavailability to appear for, required assignments and work shifts because of his religious beliefs. Petitioner contends we should reverse the Commission's determination because: (1) respondent violated the New Jersey Law Against Discrimination (LAD), N.J.S.A. 10:5-1 to -50, by failing to offer petitioner reasonable accommodations to allow him to observe his sincerely held religious beliefs; (2) the Administrative Law Judge (ALJ) upheld petitioner's removal under an incorrect legal standard; and (3) the Commission's determination is arbitrary, capricious, and unreasonable because it is not supported by substantial credible evidence. Unconvinced, we affirm.

I.

Respondent conditionally hired petitioner as a Newark police officer on or about July 31, 2017. Petitioner's employment was contingent upon his successful completion of training at the New Jersey State Police Academy (academy). He testified he practices Judaism and is a member of The Church of

God and Saints of Christ. The tenets of his religion do not permit him to work on the Sabbath—sundown on Friday nights to sundown on Saturday nights.

At all times pertinent to this appeal, the City of Newark and the Fraternal Order of Police, Newark Lodge No. 12 (FOP) were parties to a collective negotiations agreement (CNA), which governed the terms and conditions of employment for Newark police officers and prospective officers, including petitioner.[1] The CNA mandates a "4/2 schedule" for officers, meaning officers are required to work four days on and two days off each week, "which is not limited to just having Monday through Friday schedules or weekends off." The morning shifts for "[t]he 4/2 schedules . . . can range from 7:00 [a.m.] to 3:00 [p.m.], [or] 8:00 [a.m.] to 4:00 [p.m.]"; the afternoon schedules range "from 3:00 [p.m.] to 11:00 [p.m.] or 4:00 [p.m.] to 12:00 [a.m.]"; and "the first shifts . . . would be 11:00 [p.m.] until 7:00 [a.m.] or 12:00 [a.m.] until 8:00 [a.m.]"

Lieutenant James Byrd of the Newark Police Department (department) is a twenty-six-year veteran of the department and is assigned as the Executive Officer and Associate Director of the Essex County Police Academy. He

---

[1] The FOP is the collective negotiations "representati[ve] for . . . police officers in the City of Newark."

A-1405-19

testified that approximately twenty to thirty officers are assigned on each of the department's shifts. He also testified "each of those shifts [would absolutely] require [an officer] to work on a Friday night or a Saturday before sunset." He explained that when the department needs to fill a shift or does not have enough officers on a given shift and "no one volunteers" to work, the department chooses officers to work "mandatory . . . overtime."

The CNA also includes a "traditional" seniority system amongst officers, which, among other things, governs the department's grant of officers' requests to use vacation days. The CNA provides, "Vacation shall be chosen by all police officers . . . in order of seniority in rank of their unit," and "each employee shall be entitled to designate up to five . . . vacation days as single[-]use vacation days[,] which shall be taken within that calendar year with the approval of the Commanding Officer."

Prior to the commencement of his training at the academy, petitioner signed an "Acknowledgment of Work Schedule" form and a "Statement of Understanding." By executing the "Acknowledgment of Work Schedule," petitioner recognized and agreed his duties as a police officer required his availability to work on all "days, afternoons, nights, weekends[,] and/or holidays as required by" respondent; and by executing the "Statement of Understanding,"

4

petitioner confirmed his understanding of respondent's employment policies, including its training and graduation requirements for officers.

Petitioner first requested an accommodation based on his religious beliefs in late November or early December 2016, prior to his conditional hire by respondent. Petitioner requested that the Commission allow him to reschedule his Entry Level Law Enforcement Exam—originally scheduled on a Saturday—because he was not "able to participate in Saturday testing for religious reasons." The Commission requested a letter from petitioner's "rabbi or other official from [his] temple verifying [his] request for non-Saturday testing." Petitioner provided the letter, and the Commission granted his request.[2]

Petitioner next requested an accommodation based on his religious beliefs in response to an order from respondent directing "all . . . recruits [to] respond to Atlantic Uniform [(AU)] . . . either on Saturday," October 21, 2017, "or . . . Saturday," October 28, 2017, "between" 10 a.m. and 6 p.m. Petitioner testified he was unable to attend the ordered October 21 fitting because it conflicted with religious services at his church, which he attends each Saturday

---

[2] The letter is not included in the record on appeal.

A-1405-19

from "10:00 or 11:00 [a.m.]" until "the sun sets."[3] Petitioner explained he went to AU the next day and the owner informed him if he returned the following Saturday, the owner would ensure he was the first one fitted, and "it would only take five minutes." Petitioner arrived on Saturday, October 28, at approximately 9 a.m., and was fitted before attending services.[4]

Petitioner first requested an accommodation based on his religious beliefs from respondent in early December 2017, in response to a directive ordering all recruits to attend mandatory academy graduation training on Saturday, December 9, from 6:45 a.m. to 1:00 p.m. On December 3, petitioner sent an Administrative Submission to Captain Donald M. Robertella, Commander of the Police Training Division, acknowledging the training was "deemed mandatory" but "request[ing]" to be "excuse[d]" from the training because he was unable to work on the Sabbath due to his religious practice. Petitioner sent a second Administrative Submission to Robertella that day "request[ing]" to be excused

---

[3] Petitioner advised the beginning of the services is "depend[ent] on [whether it is] daylight savings time."

[4] Petitioner testified he was not "violating any of the laws of [his] church" by attending the fitting, because his religion only prevents working on the Sabbath, and the fitting was "just . . . putting on a jacket," which is not considered "working." He advised "[i]f the . . . fitting was to . . . interfere with the service," he "would [not] . . . have been able to go."

A-1405-19

from work from January 4 through January 10, 2018, because working on those dates would conflict with his "annual religious observation" of the "Holy Convocation."

In addition to his Administrative Submissions, petitioner also sent Robertella: (1) a letter dated June 28, 2017 from Elder Clement Bloomfield—the pastor of petitioner's church—confirming petitioner's religion did not permit him to work "from [sunset] on Friday until [sunset] on Saturday"; and (2) a December 2017 letter from pastor Bloomfield stating petitioner's religious beliefs "required" him to be "actively involved in full worship" in observance of the "Holy Convocation" from January 4 to January 10, 2018, and he was not permitted "to work . . . during these days."[5] Although petitioner did not inform respondent at this time, petitioner later testified he was also unvailable to work during Passover—"[a]round April 13 . . . to April 20"—but that he would "just take it as vacation."

On December 7, 2017, petitioner emailed Robertella confirming petitioner "underst[ood] . . . the meeting on [December 9, 2017 was] deemed mandatory," and reiterating that he would "not be able to attend" due to his "religious

_____

[5] The parties stipulated before the ALJ that Elder Clement Bloomfield is petitioner's father.

practice." On December 8, 2017, Robertella denied petitioner's requests, advising petitioner via email:

> We have made every effort to accommodate your request, [but] unfortunately we cannot excuse you.
>
> As a [r]ecruit, you must complete ALL mandatory training to graduate from the [a]cademy. Mandatory training includes the meeting on Saturday, December 9, 2017.
>
> When you accepted employment with the Newark Police Division, you acknowledged in writing . . . that you understood and accepted that as a Newark [p]olice [o]fficer you are required to be available for a [twenty-four-]hour [seven] day a week work schedule and that your work schedule will include, "working days, afternoons, nights, weekends, and/or holidays as required by [respondent]." You signed the Acknowledgement of Work Schedule on May 25, 2017[,] and a copy was made a part of your Candidate Investigation File.
>
> At the time that you signed the Acknowledgement of Work Schedule, you failed to notify the Newark Police Candidate Investigation [p]ersonnel, the Newark Police Division [t]raining [s]taff, and the . . . [a]cademy of your request for excusal from duty. Moreover, you participated in the . . . [a]cademy each Friday from August 4 through to December 1 and were released from duty after sundown on Fridays on many occasions.
>
> [Respondent] has a duty to protect the safety and wellbeing of the public [twenty-four] hours a day [seven] days a week.

In his reply to Robertella's email, petitioner stated that if he was not granted the accommodations, he did "not see [him]self having a future with" respondent.

Petitioner did not attend the mandatory graduation training on December 9, 2017. Two days later, petitioner sent an Administrative Submission to Robertella explaining he was absent from mandatory graduation training "based on [his] religious practice." The next day, respondent issued a "[p]reliminary [n]otice of [d]isciplinary [a]ction" suspending petitioner without pay and charging him with: "[c]hronic [i]nefficiency or [i]ncompetency," claiming "his unwillingness to work [the department's] mandatory schedule clearly demonstrates an unwillingness and/or inability to meet, obtain or produce results necessary for a satisfactory performance"; and failure to "[o]be[y] . . . [o]rders" and "[a]bsence [w]ithout [l]eave" because he did not appear for, or participate in, the mandatory graduation training despite Robertella's order.[6] On December 13, 2017, Byrd recommended a departmental hearing on the charges.

Respondent held a hearing on January 23, 2018. Petitioner appeared with counsel, waived his right to the hearing, and indicated he intended to appeal

---

[6] Of the three charges against petitioner, the notice only specifies "[c]hronic [i]nefficiency or [i]ncompetency . . . shall . . . subject [an employee] to dismissal."

respondent's decision to the Commission. Respondent issued a "[f]inal [n]otice of [d]isciplinary [a]ction," finding petitioner "guilty" on all charges. The notice further stated petitioner was "remov[ed]" from his position effective December 12, 2017.[7]

Petitioner appealed to the Commission, and the matter was referred to the Office of Administrative Law as a contested case. An ALJ conducted a two-day trial. Petitioner argued "he did not violate the department's rules and regulations because he requested accommodations for his religious beliefs," and he "claim[ed] religious discrimination based on [respondent's] failure to accommodate" in violation of the LAD. Respondent argued petitioner "violated its rules and regulations," and "the . . . accommodation[s petitioner] requested would cause [respondent] undue hardship."

Respondent called two witnesses during its case at the hearing: Byrd, and Newark Police Department Deputy Chief Arthur Jorge. Byrd testified that, after receiving petitioner's requests for accommodations, he considered the circumstances of the requests, including the department's required "schedule and rotation," the CNA's seniority system and requirements, and the potential use of

---

[7] The notice incorrectly states the effective date of petitioner's removal was December 12, 2018.

petitioner's vacation time to accommodate his requests. Byrd explained granting the accommodations would be "in conflict with the seniority provisions of the [CNA]"; "would violate [the CNA] with regard to single[-]use [vacation] days"; and would otherwise "lead to staffing shortages," compromising respondent's operational efficiency and posing a "safety" concern "for the public [and] . . . the officers." He reasoned "there are numerous tasks that come along within a day that are [unforeseen]," and "[m]inimal staffing is [only] based on what [respondent] can foresee." He testified respondent "require[s] . . . not only . . . minimal staff[,] but [it needs] to have additional people staffed or the people who have their assignments remain and call in for their position so [respondent does not] have to backtrack for the other positions that are absent." He explained that granting petitioner's "accommodation would produce an undue hardship on" respondent.

Jorge is a twenty-one-year veteran of the department and serves as Deputy Chief of Operations, a position that entails overseeing all of the department's operations, including "proper staffing" of officers. Jorge testified that to ensure respondent is prepared to address "[c]ritical incidents [that] happen throughout the [c]ity on a[ny] given shift," officers are often required to work overtime due to sickness, vacation, training, and other mandatory requirements, in addition to

11

their regular shifts. He testified the department requires "sufficient [manpower] to stabilize a neighborhood based on what happens," and there "are things that unfortunately [respondent] just can't predict." He explained Newark is different from other cities because "[i]t's a very dynamic city," and "[a] lot of population comes in and out . . . . A lot of tourists, a lot of workers." He also testified the city often has "rallies, . . . demonstrations, . . . raids," and "multiple festivals that are going on . . . [with] thousands of people in a small geographical grid[,] and these areas have to be secured," requiring respondent "to accommodate according to need."

Like Byrd, Jorge testified granting petitioner's requested accommodations "would lead to operational inefficiency." When asked "why one individual['s accommodations] would make a difference," Jorge explained respondent "lost 1/3" of its officers since a large layoff in 2010, "and the attrition rate is still continuing." He testified respondent is "losing officers faster than [it] can . . . hire" them due to retirement and disability. According to Jorge, as a result, "when an officer . . . call[s] out sick[, respondent has] to backfill [the officer's shift with] overtime" because respondent does not "have extra officers available to just plop into these areas [to] save on overtime." He also explained

officers are often required to work beyond the end of their scheduled shifts due to sickness, vacation, and other mandatory requirements within the department.

During the presentation of his case, petitioner testified to the sincerity of his religious beliefs and that respondent's mandatory work schedule conflicted with those beliefs. He argued granting his requested accommodations would impose merely a "[de minimis]" burden on respondent. When asked why he signed the "Acknowledgment of Work Schedule" stating his duties as a police officer required that he be available for work on all "days, afternoons, nights, weekends[,] and/or holidays as required by" respondent, petitioner explained:

> Because I can work seven days of the week. . . . The only thing that I asked was that on Friday[s] I could either do the 7:00 [a.m.] to 3:00 [p.m.] tour or the 8:00 [a.m.] to 4:00 [p.m.], . . . and then in the overnight on Saturday I could do either the 11:00 [p.m.] to 7:00 [a.m.] or the 12:00 [a.m.] to 8:00 [a.m.] In those time frames it doesn't conflict with the Sabbath and so that's seven days . . . and I can work every holiday.

Petitioner acknowledged that when he executed the form, he "understood" the department is "a 24/7 operation," but he stated he believed if he submitted his requests and documentation to respondent, it would accommodate him.

Petitioner also called the president of the Newark FOP, Detective James Stewart, Jr., who testified not "everybody is ordered to work" during rallies and festivals, but rather the scheduling for these events is first made on a "volunteer

13

basis." He explained an officer could work multiple days if he or she volunteered, but "[n]obody would be ordered to work multiple days of that event." Further, he stated that even if the department was short on personnel for a given event, officers required to work mandatory overtime are able to pick their own shifts, "whether it would be Friday, Saturday[,] or Sunday." He also testified an officer who is unable to work an assigned shift can "swap shifts" with other officers, and officers typically do not get held over from one shift to another. Finally, he testified that although an officer working a shift not specified in the CNA constitutes a violation of the agreement, the FOP would not "make an issue of" the violation, and it would not "stand in the way of a[n] . . . [o]fficer coming on a job that has an obstacle because of a schedule." He asserted the FOP may work out a different schedule in certain circumstances, and it had done so previously within different units of respondent.[8]

In a September 27, 2019 initial decision, the ALJ recommended upholding respondent's termination of petitioner's employment. However, rather than

---

[8] Petitioner also called Charesse Forbes, who is a member of the same church as petitioner. Forbes testified concerning the church's tenet of honoring the Sabbath from sunset on Friday to sunset on Saturday and that no work may be performed during that period. Petitioner also called Brian Funchess, who is petitioner's manager at petitioner's employment as a security supervisor at a hospital. Funchess described petitioner's duties and explained the hospital has never required petitioner to work during the Sabbath.

characterizing respondent's action as a disciplinary "removal," the ALJ deemed it a "release[] . . . at the end of [petitioner's] working test period."

The ALJ determined petitioner "was extremely sincere in his testimony regarding the importance of his religious beliefs." She also found the following: (1) petitioner's "ability to use vacation days is restricted by the [CNA], where he would only be able to rely on this method five times"; (2) due to the CNA's seniority provision, respondent "would be unable to accommodate [petitioner]'s requests for a week off for the Holy Convocation and another week off for Passover if senior officers requested those days off"; (3) petitioner's "proposition to shift swap is unreliable due to provisions set forth in the [CNA] and the frequency of transfers of the officers"; (4) "[e]ven if [petitioner] found an officer to consistently swap shifts with, [respondent] would be burdened to find a replacement if that officer called out sick, took vacation time, or was transferred to another shift"; and (5) "due to the[] dynamics [of the city], . . . every officer counts[,] and the absence of [petitioner] could negatively affect [respondent]'s operations."

The ALJ was also "persuaded that [respondent]'s policies are reasonable, and that [respondent proved], by a preponderance of the credible evidence, that [it] will be unable to accommodate [petitioner] based upon his religious beliefs

15

and for the safety of its officers." The ALJ then concluded petitioner did not sustain his burden of demonstrating respondent "released him at the end of his working test period" "in bad faith." See N.J.A.C. 4A:2-4.3(b).

Petitioner filed exceptions to the ALJ's decision with the Commission. In its final decision, the Commission noted "the ALJ inexplicably treated this matter as a release at the end of the working test period appeal pursuant to N.J.A.C. 4A:2-4.1 [to -4.3]," see N.J.S.A. 11A:2-6(a)(4), instead of as a disciplinary "[r]emoval," see N.J.S.A. 11A:2-6(a)(1). The Commission found petitioner, "as a [p]olice [o]fficer who had not yet fully completed his academy training, had not yet even started his working test period." The Commission noted "[t]he implication of [the] error [was] potentially significant" due to the different burdens of proof associated with the two disciplinary actions, see N.J.S.A. 11A:2-21, but it determined the "error [was] not fatal" because the ALJ also found respondent "satisfied its burden of proof" for disciplinary removal by proving its "policies are reasonable, . . . [that it] will be unable to accommodate [petitioner] based upon his religious beliefs and for the safety of its officers," and that "the proffered disciplinary charges have been sustained by a preponderance of the evidence," see ibid.; see also In re Polk, 90 N.J. 550, 560 (1982) ("[T]he usual burden of proof for establishing claims before state

agencies in contested administrative adjudications is a fair preponderance of the evidence.").

The Commission accepted the ALJ's factual findings and, despite the ALJ's treatment of the matter "as a release at the end of the working test period," accepted the ALJ's conclusions. "Accordingly, the Commission reject[ed] any findings or conclusions in the initial decision relating to [the] matter being considered a working test period appeal"; found respondent "prove[d], by a preponderance of the evidence, that [it] will be unable to accommodate [petitioner] based upon his religious beliefs and for the safety of its officers"; and "uph[eld] . . . [petitioner]'s removal."[9] This appeal followed.

II.

"Our scope of review of an administrative agency's final determination is limited." In re Adoption of Amends. to Ne., Upper Raritan, Sussex Cnty., 435 N.J. Super. 571, 582 (App. Div. 2014). When reviewing an administrative agency's decision, our limited standard of review is guided by three inquiries:

> (1) [W]hether the agency's action violates express or implied legislative policies, that is, did the agency follow the law; (2) whether the record contains

---

[9] An administrative "agency head may reject or modify [an ALJ's] findings of fact, conclusions of law[,] or interpretations of agency policy in [its] decision," as long as he or she "state[s] clearly the reasons for doing so." N.J.S.A. 52:14B-10(c).

> substantial evidence to support the findings on which the agency based its action; and (3) whether in applying the legislative policies to the facts, the agency clearly erred in reaching a conclusion that could not reasonably have been made on a showing of the relevant factors.
>
> [Blanchard v. N.J. Dep't of Corr., 461 N.J. Super. 231, 238 (App. Div. 2019) (alteration in original) (quoting In re Carter, 191 N.J. 474, 482 (2007)).]

The burden of demonstrating that a final agency decision should be reversed falls on the party challenging the decision. Adoption of Amends., 435 N.J. Super. at 582. "[W]here there is substantial evidence in the record to support more than one regulatory conclusion, it is the agency's choice which governs," id. at 583 (alteration in original) (quoting Murray v. State Health Benefits Comm'n, 337 N.J. Super. 435, 442 (App. Div. 2001)), and we "may not substitute [our] . . . judgment for the agency's, even though [we] might have reached a different result," In re Stallworth, 208 N.J. 182, 194 (2011) (quoting Carter, 191 N.J. at 483). However, we are "in no way bound by an agency's . . . determination of a strictly legal issue." K.K. v. Div. of Med. Assistance & Health Servs., 453 N.J. Super. 157, 161 (App. Div. 2018) (quoting L.A. v. Bd. of Educ. of Trenton, 221 N.J. 192, 204 (2015)).

Petitioner first claims the Commission's decision should be reversed because the ALJ mistakenly analyzed the case as a termination at the end of a

working test period instead of as a disciplinary removal. Petitioner correctly argues those separate and different actions involve different burdens of proof. In a disciplinary removal case, "the employer shall have the burden of proof[,] while in [cases of termination at the end of an employee's working test period], the employee shall have the burden of proof." N.J.S.A. 11A:2-21; see also N.J.S.A. 11A:2-6(a)(1) to (4); N.J.A.C. 4A:2-4.3(b) (providing in cases of termination at the conclusion of the working test period, the burden falls on the employee to prove the employer's "action was in bad faith"); Polk, 90 N.J. at 560 (explaining an appointing authority has the burden of establishing the truth of disciplinary charges by a preponderance of the evidence for the removal of a civil service employee). We agree with petitioner's claim the ALJ erred by finding respondent terminated petitioner's employment at the end of his working test period, rather than considering respondent's action as the disciplinary removal respondent acknowledges it was.

We are not persuaded the ALJ's error requires a reversal of the Commission's decision. The Commission recognized the ALJ's error but did not repeat the error in rendering its final decision. The Commission instead "considered the record and the ALJ's initial decision," made "an independent evaluation of the record," accepted the ALJ's findings of fact, and applied the

burden of proof applicable to a disciplinary removal. The Commission then determined respondent "satisfied its burden of proof" by establishing its "policies are reasonable, . . . [that it] will be unable to accommodate [petitioner] based upon his religious beliefs and for the safety of its officers," and "that the proffered disciplinary charges have been sustained by a preponderance of the evidence." Based on those findings, the Commission determined respondent sustained its burden of proof of establishing the disciplinary charges against petitioner.

We review the Commission's final decision on appeal, see Silviera-Francisco v. Bd. of Educ. of Elizabeth, 224 N.J. 126, 136-37 (2016); R. 2:2-3(a)(2) (providing, in pertinent part, "appeals may be taken to the Appellate Division as of right . . . to review final decisions or actions of any state administrative agency" (emphasis added)), and the record establishes the Commission applied the correct burden of proof standard in making its final determination, and properly placed the burden on respondent, see N.J.S.A. 11A:2-21. The ALJ's initial error therefore provides no basis to reverse the Commission's final decision.

Petitioner also argues the Commission's determination respondent was "unable to accommodate" petitioner and its resulting decision to uphold

petitioner's termination are not supported by credible record evidence. He further contends the decision should be reversed because he presented a prima facie case of religious discrimination.

"Under the LAD, employers cannot impose any condition upon employees that 'would require a person to violate . . . sincerely held religious practice or religious observance,'" Tisby v. Camden Cnty. Corr. Facility, 448 N.J. Super. 241, 248 (App. Div. 2017) (alteration in original) (quoting N.J.S.A. 10:5-12(q)(1)), "including but not limited to the observance of any particular day or days or any portion thereof as a Sabbath or other holy day in accordance with the requirements of the religion or religious belief," N.J.S.A. 10:5-12(q)(1). "However, an exception exists if an employer cannot [reasonably] accommodate 'the employee's religious observance or practice without undue hardship on the conduct of the employer's business' after putting forth a 'bona fide effort' to accommodate."[10] Tisby, 448 N.J. Super. at 248 (quoting N.J.S.A. 10:5-12(q)(1)). "An 'undue hardship' is defined as 'an accommodation requiring unreasonable expense or difficulty, unreasonable interference with the safe or

---

[10] "An accommodation is reasonable if it 'eliminates the conflict between employment requirements and religious practices by allowing the individual to observe fully.'" EEOC v. Geo Grp., Inc., 616 F.3d 265, 291 (3d Cir. 2010) (quoting Ansonia Bd. of Educ. v. Philbrook, 479 U.S. 60, 70 (1986)).

efficient operation of the workplace or a violation of a bona fide seniority system or a violation of any provision of a bona fide [CNA].'" Ibid. (quoting N.J.S.A. 10:5-12(q)(3)(a)); see also Trans World Airlines, Inc. v. Hardison, 432 U.S. 63, 79 (1977) ("Without a clear and express indication from Congress, we cannot agree . . . that an agreed-upon seniority system [in a CNA] must give way when necessary to accommodate religious observances.").

"To analyze claims under the LAD, New Jersey has adopted the 'procedural burden-shifting methodology articulated in McDonnell Douglas Corp. v. Green, 411 U.S. 792 [(1973)].'"[11] Tisby, 448 N.J. Super. at 248 (quoting Zive v. Stanley Roberts, Inc., 182 N.J. 436, 447 (2005)). Under this analytical paradigm, petitioner has the burden to "first demonstrate a prima facie case of employment discrimination." Ibid. To establish a prima facie case of religious discrimination, petitioner must demonstrate: "(1) [he] belongs to a protected

---

[11] "In LAD cases, we 'frequently look to federal precedent . . . as "a key source of interpretive authority,"' unless 'that law sharply diverges from prior authority construing the LAD [or does not] further[] the objectives of the LAD [or] comport[] with our prior holdings.'" Crisitello v. St. Theresa Sch., 465 N.J. Super. 223, 228 n.2 (App. Div. 2020) (second, third, fourth, and fifth alterations in original) (quoting Aguas v. State, 220 N.J. 494, 510 n.4 (2015)); see also Turner v. Wong, 363 N.J. Super. 186, 210 (App. Div. 2003) (finding "[i]n interpreting the LAD, the federal law has consistently been considered for guidance").

class; (2) []he was performing [his] job at a level that met [his] employer's legitimate expectations; (3) []he suffered an adverse employment action; and (4) others not within the protected class did not suffer similar adverse employment actions."[12] Ibid. (quoting El-Sioufi v. St. Peter's Univ. Hosp., 382 N.J. Super. 145, 167 (App. Div. 2005)).

"Once a [petitioner] establishes a prima facie case [of discrimination], an 'inference of discrimination' is created." Ibid. (quoting Zive, 182 N.J. at 449). The burden then shifts to the employer to "combat the inference of discrimination by articulating a 'legitimate, nondiscriminatory reason for the employer's action.'" Id. at 248-49 (quoting Zive, 182 N.J. at 449). Where a

---

[12] Petitioner claims that to support a prima facie case of "failure to accommodate based on religious beliefs, [an] employee must show[:] . . . [(1)] they hold a sincere religious belief that conflicts with a job requirement, . . . [(2)] they informed their employer of the conflict, and . . . [(3)] they were disciplined for failing to comply with the conflicting requirement." To support this proposition, petitioner cites to Webb v. City of Philadelphia, 562 F.3d 256, 259 (3rd Cir. 2009). However, the standard proffered by petitioner differs from the standard we articulated in Tisby v. Camden County Correctional Facility, 448 N.J. Super. 241, 248 (App. Div. 2017) and El-Sioufi v. St. Peter's University Hospital, 382 N.J. Super. 145, 167 (App. Div. 2005)—two cases concerning alleged failures to accommodate employees' religious beliefs—in which we found the standard to prove a prima facie claim of discrimination based on a failure to accommodate is the same standard we use to analyze all employment-related religious discrimination claims under the LAD. Because the standard articulated in Webb does not "comport with [these] prior holdings," we do not apply it here. Crisitello, 465 N.J. Super. at 228 n.2 (quoting Aguas, 220 N.J. at 510 n.4).

A-1405-19

petitioner alleges a failure to accommodate, the employer must provide a "legitimate[,] non-discriminatory reason[] why" it "cannot accommodate 'the employee's religious observance or practice without undue hardship on the conduct of the employer's business' after putting forth a 'bona fide effort' to accommodate." Ibid. (quoting N.J.S.A. 10:5-12(q)(1)).

"If the employer can meet its burden, the burden again shifts back to the employee to prove the reason provided by the employer is 'merely a pretext for discrimination and not the true reason for the employment decision.'" Id. at 249 (quoting Zive, 182 N.J. at 449). "A plaintiff can prove pretext by using either circumstantial or direct evidence that 'discrimination was more likely than not a motivating or determinative cause of the action' or [the] plaintiff can discredit the legitimate reason provided by the employer." Ibid. (quoting El-Sioufi, 382 N.J. Super. at 173).

Here, it is undisputed petitioner established a prima facie case of religious discrimination. Petitioner's arguments focus on the second prong of the McDonnell Douglas paradigm. He contends respondent failed to satisfy its burden of demonstrating it could not reasonably accommodate his religious beliefs without undue hardship after making a bona fide effort to accommodate. In other words, petitioner contends the Commission erred because the record

24                                                                    A-1405-19

lacks substantial credible evidence supporting a determination respondent made a bona fide effort to accommodate petitioner's religious beliefs and that respondent will suffer an undue hardship if it grants petitioner's requested accommodations. See id. at 248; see also N.J.S.A. 10:5-12(q)(1). In his brief on appeal, petitioner asserts that "not only did [respondent] not offer . . . reasonable accommodation[s], . . . [it] did not make a good faith effort to accommodate him."

We reject petitioner's argument because there is substantial credible evidence supporting the Commission's findings. See Adoption of Amends., 435 N.J. Super. at 582 (quoting J.D. ex rel. D.D.H. v. N.J. Div. of Developmental Disabilities, 329 N.J. Super. 516, 521 (App. Div. 2000)). Petitioner acknowledges "Byrd testified as to the lengths [respondent] went to attempt to accommodate [petitioner]." Byrd considered the department's required "schedule and rotation"; examined the CNA's seniority system; reviewed respondent's overtime policies and requirements; and assessed the potential for petitioner to use vacation time to accommodate his requests for the purpose of determining whether petitioner's religious beliefs and practices could be accommodated.

Petitioner argues respondent did not establish a bona fide effort to accommodate him because "at no point was [he] actually privy to [respondent's efforts] or even asked whether an accommodation would be amenable to him and his religious practices."  Petitioner contends respondent "did not even give [him] the opportunity to be accommodated," and that respondent "could have . . . put [him] on a probationary period, or 'working test period' to see how his need for an accommodation would work."  He argues "no individual has ever been accommodated by the [d]epartment for religious reasons, [and respondent]'s denial of [his] accommodation is based purely on conjecture or speculation."  See Miller v. Port Auth. of N.Y. & N.J., 351 F. Supp. 3d 762, 789 (D.N.J. 2018) ("An analysis of undue hardship may not be based on mere speculation or conjecture.").

We are unpersuaded by petitioner's contentions.  Petitioner requested accommodations that were specific, well-defined, and known to respondent.  He sent two letters unequivocally advising respondent he: (1) could not work during the Sabbath; (2) could not attend mandatory graduation practice because it fell on the Sabbath; and (3) could not work the week of January 4 to 10, 2018, due

to his religion.[13] Petitioner offers no reason respondent's failure to request his participation in its efforts to determine whether it could grant the requested accommodations caused him any prejudice or requires a finding respondent's efforts, as described in detail by Byrd, were not bona fide. Again, the accommodation petitioner required was clear and unequivocal. Indeed, he informed respondent that if the accommodation he requested was not granted—which did not yet include his inability to work during the week of Passover—he did "not see [him]self having a future with" respondent. Petitioner does not suggest there were any other reasonable accommodations—other than those he specifically requested, and respondent considered and rejected—that respondent may have provided without imposing the undue hardship described by Byrd and Jorge. See EEOC v. Geo Group, Inc., 616 F.3d 265, 291 (3d Cir. 2010) (defining a reasonable accommodation as one which "eliminates the conflict between

---

[13] We do not address respondent's denial of petitioner's request to be excused from mandatory graduation training, nor do we address the charges of failure to "[o]be[y] . . . [o]rders" and "[a]bsence [w]ithout [l]eave" issued to petitioner subsequent to his absence from the training. Petitioner's disciplinary charge of "[c]hronic [i]nefficiency or [i]ncompetency" due to his purported "unwillingness to work [the department's] mandatory schedule . . . [and resulting] unwillingness and/or inability to meet, obtain[,] or produce results necessary for a satisfactory performance" subjected him to termination if sustained, and respondent did not tether that charge to petitioner's absence from graduation training. See N.J.A.C. 4A:2-2.3(a).

employment requirements and religious practices by allowing the individual to observe fully" (quoting Ansonia Bd. of Educ. v. Philbrook, 479 U.S. 60, 70 (1986))).

Petitioner also claims respondent "did not . . . give [him] the opportunity to be accommodated" by "put[ting him] on a probationary period, or 'working test period' to see how his need for an accommodation would work," and "[s]ince no individual has ever been accommodated by the [d]epartment for religious reasons," Byrd's and Jorge's testimony concerning the safety and efficiency concerns associated with granting petitioner's accommodations constitutes "pure[] . . . conjecture or speculation." See Miller, 351 F. Supp. 3d at 789. We disagree.

"[A]n employer is not required 'to wait until it [feels] the effects' of [a] proposed accommodation before determining its reasonableness." Ibid. (second alteration in original) (quoting EEOC v. Firestone Fibers & Textiles Co., 515 F.3d 307, 317 (4th Cir. 2008)). Rather, "[e]mployers must be given leeway to plan their business operations and possible accommodative options in advance, relying on an accommodation's predictable consequences along the way." Ibid. (quoting Firestone Fibers, 515 F.3d at 317). Thus, the fact respondent did not grant, or "test," the accommodation petitioner requested did not preclude

respondent from reasonably determining it could not provide the necessary accommodations without undue hardship.

Further, respondent's determination that provision of the requested accommodation would cause undue hardship was not based on either speculation or conjecture. It was instead founded on the testimony, which the ALJ and Commission found credible, of two experienced officers charged with overseeing various operations within the department. Byrd and Jorge testified: (1) concerning the unique nature and needs of the city; (2) that, due to the circumstances extant in the city, the department "require[s] . . . not only . . . minimal staff[,] but [also] to have additional people staffed"; (3) that respondent is "losing officers faster than [it] can actually hire" and it thus does not "have extra officers available" to cover the shifts petitioner requested off; and (4) that granting petitioner's accommodations would therefore "lead to" the department suffering from further "staffing shortages."

Petitioner requested to be excused for multiple weeks throughout the year when respondent otherwise mandates all officers be available to ensure it is prepared to handle whatever public safety issues may arise in the city. Byrd and Jorge explained the department's staffing needs, the existence of staffing shortages, the manner in which filling staffing needs is governed and limited by

29

the CNA, and the need for officers to be available to work at all times due to the normal and unique safety concerns presented daily in Newark. In addition, they explained that permitting petitioner to use vacation time to accommodate his religious observance "would violate" the CNA's seniority and vacation provisions.[14] See N.J.S.A. 10:5-12(q)(3)(a) (explaining an accommodation which results in the violation of a CNA provision constitutes an undue hardship).

Their testimony is also wholly consistent with the Acknowledgement of Work Schedule petitioner signed prior to the commencement of his training and

---

[14] The CNA states, "Vacation shall be chosen by all police officers . . . in order of seniority in rank of their unit." The evidence established that accommodating petitioner by allowing him to utilize vacation days would permit him to select his vacation days each year prior to more senior officers. See Trans World Airlines, 432 U.S. at 79 ("[A]n agreed-upon seniority system [does not] give way when necessary to accommodate religious observances."). Further, the evidence showed respondent could not permit, in a manner consistent with the requirements of the CNA, petitioner's use of vacation days for his observance of the Sabbath and the other religious events for which he sought to be absent from duty. Stewart's testimony the FOP would not "make an issue" of the violation of the CNA that would result if respondent accommodated petitioner simply confirms respondent's position it could not accommodate petitioner without violating the CNA's seniority and vacation provisions. Moreover, Stewart's testimony did not modify the CNA and is not contractually binding. Because allowing petitioner to utilize vacation days to accommodate his religious beliefs conflicted with the seniority system and vacation-day provisions in the "bona fide" CNA, respondent could not grant this accommodation absent "undue hardship." Tisby, 448 N.J. Super. at 248 (quoting N.J.S.A. 10:5-12(q)(3)(a)); see also Trans World Airlines, 432 U.S. at 79.

A-1405-19

any request for an accommodation. As noted, the form explained that Newark police officers must be available to work all shifts on each day of the year to provide police services to the city.[15] Thus, Byrd's and Jorge's testimony addressed the "predictable consequences" of granting petitioner's requested accommodation, which the Commission could properly consider and "rely[] on" to determine respondent could not grant the accommodation without undue hardship. Miller, 351 F. Supp. 3d at 789 (quoting Firestone Fibers, 515 F.3d at 317).

In Geo Group, the Equal Employment Opportunity Commission (EEOC) filed a complaint alleging religious discrimination on behalf of female Muslim employees against the defendant employer—the operator of a corrections facility—due to the defendant's alleged "fail[ure] to accommodate the [employees] by providing them an exception to the prison's dress policy that otherwise precluded them from wearing Muslim head coverings called khimars at work." 616 F.3d at 267. The defendant argued, based on the testimony of the facility's warden and deputy warden, that allowing employees to wear khimars

---

[15] Respondent does not argue petitioner's unavailability to work all shifts, at all times, on each day of the year constitutes an undue hardship because it "result[s] in the inability of [petitioner] to perform the essential functions of the position in which he . . . is employed." N.J.S.A. 10:5-12(q)(3)(c). We therefore do not address the issue.

at the facility would present safety concerns because the khimars could potentially be used as a weapon to "strangle" someone or to smuggle "contraband." Id. at 270, 273-75. Although the defendant offered no direct evidence of khimars being used this way in the past, the Third Circuit relied on the wardens' testimony about the potential safety threats posed by the possible uses of khimars and found that "[e]ven [if] khimars present only a small threat of the asserted dangers, they do present a threat which is something . . . [the defendant] is entitled to attempt to prevent." Id. at 274. The court concluded the defendant satisfied its burden to establish that granting the accommodation would raise safety concerns and impose an undue hardship. Id. at 274-75. Because the EEOC did not establish the defendant's assertion of an undue hardship was pretextual, the court affirmed the trial court's grant of summary judgment to the defendant.[16] Id. at 275, 277.

In Tisby, we considered a similar claim against a defendant corrections facility by a Muslim employee alleging the defendant failed to accommodate her by not allowing her to wear a khimar in violation of the defendant's dress policy.

---

[16] The majority in Geo Group did not expressly address the issue of pretext, but, pursuant to the McDonnell Douglas standard, a finding of pretext would have sustained the EEOC's burden and precluded the court's affirmance of summary judgment to the defendant. 411 U.S. at 804.

448 N.J. Super. at 244-46. The defendant moved for summary judgment "and provided a certification from the [w]arden" asserting in part that the defendant's "uniform policy ensured 'the safe and orderly operation of [its] facilit[y],'" and "any accommodation to [the] plaintiff would impose an undue hardship on [the] defendant[]." Id. at 246. We endorsed the Third Circuit's finding in Geo Group, and agreed, "[a]fter weighing the safety concerns, including the safety risk and the ability to hide contraband in head coverings, as well as the necessity of uniform neutrality," that the "defendant[] met [its] burden of establishing [the] accommodation was a hardship." Id. at 250. Because the plaintiff did not prove "the [defendant]'s reasons for denying an accommodation were . . . pretextual," we concluded the "plaintiff failed to overcome the finding of a hardship to [the] defendant[]," and that therefore the grant of summary judgment to the defendant "was proper[]." Ibid.

The circumstances presented by petitioner's request for an accommodation are similar to those in Tisby and Geo Group. Here, the ALJ accepted as credible the testimony of two veteran Newark police officers with knowledge and experience concerning the department's operations and requirements, who testified the department's workforce has been "decimat[ed]" in recent years by "attrition," "retirement[,] and disability"; it is still "losing officers faster than

33                                                                          A-1405-19

[it] can . . . hire"; it does not "have extra officers available" to cover vacant shifts without requiring overtime; and granting petitioner's accommodation would exacerbate the department's "staffing shortages," posing a "safety" concern "for the public [and] . . . the officers" and compromising respondent's operational efficiency. Based on that testimony, the ALJ found respondent established it was "unable to accommodate [petitioner] based upon his religious beliefs and for the safety of its officers." The Commission agreed.

In accord with Tisby and Geo Group, we agree the testimony of Byrd and Jorge concerning the department's safety and operational concerns, and the manner in which accommodating petitioner's religious beliefs will violate the CNA, satisfies respondent's "burden of establishing [the] accommodation was a hardship." Tisby, 448 N.J. Super. at 250; see also Geo Grp., 616 F.3d at 274-75. Therefore, contrary to petitioner's assertion, there is substantial credible evidence supporting the Commission's finding that respondent made a bona fide effort to accommodate petitioner's religious beliefs and respondent demonstrated that providing an accommodation would constitute an undue hardship under N.J.S.A. 10:5-12(q)(3)(a). Respondent clearly satisfied its burden under the second prong of the McDonnell Douglas paradigm. See Tisby, 448 N.J. Super. at 248-49.

The burden then shifted to petitioner to establish respondent's assertion of an undue hardship was pretextual "and not the true reason for the employment decision." Id. at 249 (quoting Zive, 182 N.J. at 449). Petitioner does not point to any evidence establishing "discrimination was more likely than not [the] motivating . . . cause" of respondent's action or discrediting respondent's "legitimate, non[-]discriminatory reason" for its action—its inability to provide the accommodation without undue hardship after making a bona fide effort to provide the accommodation. See id. at 248-49 (quoting Zive, 182 N.J. at 449); see also N.J.S.A. 10:5-12(q)(3)(a). In fact, petitioner does not argue on appeal the Commission erred by concluding he failed to present evidence establishing pretext under the third prong of the McDonnell Douglas standard. See Tisby, 448 N.J. Super. at 249. Our independent review of the record confirms petitioner failed to sustain that burden.

Petitioner fails to demonstrate the Commission's decision is inconsistent with applicable law, unsupported by substantial credible evidence, or based on a misapplication of legislative policies to the facts. See Blanchard, 461 N.J. Super. at 238 (quoting Carter, 191 N.J. at 482). As we have explained, petitioner's appeal is founded on a claim the Commission erred by failing to find his termination constituted unlawful discrimination based on his religious

beliefs and respondent's refusal to provide an accommodation for those beliefs. We find no merit to petitioner's contention because, as noted, respondent presented sufficient credible evidence establishing it made a bona fide attempt to accommodate petitioner and it would suffer an undue hardship by doing so. Petitioner failed to demonstrate respondent's reasons for its termination of his employment were a pretext for discrimination and, for that reason, petitioner's religious discrimination claim fails. See Tisby, 448 N.J. Super. at 250; see also N.J.S.A. 10:5-12(q)(3)(a). We therefore discern no basis to reverse the Commission's decision upholding respondent's termination of petitioner's conditional employment for the cited disciplinary reasons.

To the extent we have not expressly addressed any of petitioner's remaining arguments, we find they lack sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-1405-19